# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

John Ciaccio,                           Plaintiff,

                                                            Civil No.

vs.

3M Company and
Aearo Technologies, LLC,

                                        Defendants.        **Complaint**

Plaintiff states and alleges as follows:

### BACKGROUND

1.   This is a product liability action related to a defective earplug manufactured and sold by Defendants. Plaintiff used Defendants' dual-ended Combat Arms™ Earplugs - Version 2 and, as a result of its defective condition, now suffers from hearing loss and tinnitus. Defendants knew the earplugs were defective prior to selling them because they falsified test results and misrepresented their performance specifications to qualify for a multi-million dollar per-year contract with the United States.

## JURISDICTION AND VENUE

2.   This Court has subject matter jurisdiction because there is complete diversity between Plaintiff and Defendants. 28 U.S.C. § 1332(a)(1) and the amount in controversy exceeds $75,001 exclusive of costs and interest. This Court has personal jurisdiction over Defendants because their respective principal places of business are in Minnesota; moreover, they each have a registered agent for service of process in Minnesota and therefore consented to be sued in Minnesota.   Both Defendants also have sufficient contacts with Minnesota because they do business in and through Minnesota.

3.   Venue is properly laid in this Court under 28 U.S.C. §§ 1391(b) and (c) because Defendants principal places of business are in this District and each Defendant has a service agent in Minnesota.

4.   Venue is also proper in this District because Defendants have marketed, sold, or otherwise disseminated Combat Arms™ Earplugs, Version 2 in this District.

## PARTIES

5.   Plaintiff joined the United States Marines in 1991 at the age of 21. He is a citizen of South Carolina. Before joining the Marines, Plaintiff had no signs or symptoms of hearing loss or tinnitus.

6.   Plaintiff served in the Marines from 1991 through 2017. Both stateside and during his three deployments to Iraq, Afghanistan, and Iraq respectively, Plaintiff worked maintenance, demolition, and as a convoy team member.

7.   Plaintiff was issued a pair of standard-issue Combat Arms™ earplugs. Plaintiff continued to wear the Combat Arms™ earplugs for the remainder of his service.

8.   Stateside, Plaintiff wore his Combat Arms™ earplugs during training live fire exercises, on the firing range, and in the maintenance bays. In each instance, Plaintiff was exposed to loud impulse noises and explosions.

9.   While deployed, Plaintiff wore his Combat Arms™ earplugs at the firing range; while operating heavy machinery; while under live fire, mortar, and IED attacks; and while on convoys.

10. Plaintiff was never instructed to fold back the third flange on the opposite side of the use end of the Combat Arms™ earplug.

11. Plaintiff was diagnosed with hearing loss and tinnitus in 2009 and must wear hearing aids.

12. Defendant 3M is a Delaware corporation with its principal place of business in Minnesota.

13. Defendant Aearo Technologies LLC is a limited liability company formed in Delaware with its principal place of business in Minnesota.

## FACTUAL ALLEGATIONS

14. Aearo Technologies was the global market leader in hearing and eye protection and was based in Indianapolis, Indiana. Aearo Technologies developed, marketed, and sold the Combat Arms™ earplug until being acquired by 3M in 2008 for $1.2 billion.

Afterwards, 3M hired Aearo's employees and maintains it as a separate operating unit. Post-acquisition, the Combat Arms™ earplugs have been marketed and sold under the 3M brand. Because 3M acquired both the assets and liabilities of Aearo, Aearo and 3M are used interchangeably and all allegations against Aearo are directed as a matter of law against 3M.

15. Aearo developed dual-ended, non-linear (selective attenuation) Combat Arms™ earplugs for the specific purpose of providing servicemen a single set of earplugs that provide two options for hearing attenuation depending on how they are worn:



16. The earplugs can be worn in an open or "unblocked" position (yellow end in) to block, or at least significantly reduce, loud impulse sounds commonly associated with military service, while still allowing the serviceman to hear quieter noises such as

commands spoken by fellow servicemen and approaching enemy combatants. Alternatively, the earplugs can be worn in a closed or "blocked" position (green end in) to block, or at least significantly reduce, all sounds, i.e., operate as ordinary earplugs.

17. Based on the supposed technological design and qualities of the Combat Arms™ earplugs, Defendants won a series of Indefinite-Quantity Contracts ("IQCs") to be the exclusive supplier of selective attenuation earplugs to the U.S. military between 2003 and 2012.

18. To win these IQCs, Defendants represented that the Combat Arms™ earplugs would meet specific performance criteria established by the U.S. Government as a prerequisite for bidding on the IQC for earplugs.

19. At all times, Defendants' performance representations were false; and Defendants knew them to be false. In fact, Defendants knew these earplugs were defective and did not work as they were supposed to as early as 2000—years before Defendants became the exclusive supplier of selective attenuation earplugs to the U.S. military.

20. At all relevant times, the Combat Arms™ earplugs had a dangerous design defect that caused them to imperceptibly loosen in the wearer's ear, thus allowing damaging sounds to enter the ear canal around the outside of the earplug. Specifically, the basal edge of the third flange of the non-inserted end of the earplug is prone to press against some wearers' ear canals and fold back to its original shape, thereby loosening the seal in

their ear canals. Because the earplug is symmetrical, the defect exists regardless of which end is inserted into the ear.

21. Aearo learned of this design defect when it completed testing of the Combat Arms™ earplugs. In fact, in February 2000, after the Combat Arms™ earplugs first failed the specification testing, Aearo employees rolled back the non-inserted yellow flanges to mitigate the loosening effect of the defect.

22. The value and effectiveness of earplugs has been standardized under federal law through a Noise Reduction Rating ("NRR"). The testing and labeling of earplugs such as the Combat Arms™ earplugs to achieve an NRR is governed by federal regulations promulgated by the Environmental Protection Agency ("EPA") pursuant to the Noise Control Act, 42 U.S.C. § 4901 *et seq.* Specifically, 40 C.F.R. §211.206-1 provides:

> The value of sound attenuation to be used in the calculation of the Noise Reduction Rating must be determined according to the "Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs." This standard is approved as the American National Standards Institute Standard (ANSI-STD) S3.19-1974.

23. Further, 40 C.F.R. §211.204-4(e) requires that specific supporting information accompany hearing protection devices sold in the United States:

> The following minimum supporting information must accompany the device in a manner that insures its availability to the prospective user. In the case of bulk packaging and dispensing, such supporting information must be affixed to the bulk container or dispenser in the same manner as the label, and in a readily visible location…. **Instructions as to the proper insertion or placement of the device.**

(Emphasis added).

**A. Aearo Deliberately Falsified Test Results for the Combat Arms™ Earplugs**

24. The NRR is supposed to represent the amount of sound attenuation experienced by a test group under conditions specified by the federal Noise Control Act's testing methodology.

25. In addition, the U.S. military may only purchase earplugs that meet the testing standards established by the U.S. Army Public Health Command, Army Hearing Program, or equivalent standards that may be established by other branches of the military. Any such standards are tied to the NRR achieved under the EPA regulations.

26. In or around January 2000, Aearo began NRR testing on each end of the Combat Arms™ earplug. Rather than use an independent test lab, Aearo performed its testing in-house at its E-A-RCAL laboratory (also now owned by 3M). Aearo selected 10 test subjects, including some of its own employees. Aearo's test protocol involved testing: (1) the subject's hearing without an earplug; (2) the subject's hearing with the open/unblocked (yellow) end of the Combat Arms™ earplug inserted; and (3) the subject's hearing with the closed/blocked (green) end of the Combat Arms™ earplug inserted.

27. Aearo's own employees monitored the test results as the tests were performed, which allowed them to stop the testing at any point if they were not achieving the desired NRR. This violated the ANSI S3.19-1974 testing protocol. In fact, Aearo stopped the test of the green end of the Combat Arms™ earplug inserted after only 8 of the 10 subjects had been tested. At that point, the Combat Arms™ earplugs were failing expectations

miserably. Aearo was expecting to achieve an NRR of 22 with the green end inserted, but in fact was on target to receive a 10.9 rating based on the experiences of the first eight subjects. These disappointing results were caused by the design defect described above.

28. Despite stopping the test on the green end of the Combat Arms™ earplug, Aearo had the remaining two test subjects complete the test with respect to the yellow end of the Combat Arms™ earplugs only because Aearo liked the low NRR rating the test was indicating to that point. After completion, however, testing of the yellow end resulted in an NRR of -2, which falsely suggested that the earplugs actually amplified sound. Aearo thus knew that the test was inaccurate and needed to be repeated. Instead, Aearo changed the -2 NRR to a 0 NRR, and used that rating on its labels.

29. After prematurely stopping the NRR test of the green end of the Combat Arms™ earplug, Aearo investigated the disappointing test results and discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit as required by ANSI S3.19-1974, Section 3.2.3. (Ex. A, Acoustical Society of America Standard Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs (ASA STD 1-1975)).

30. Aearo also discovered that when the green end of the Combat Arms™ earplug was inserted into the ear using the standard fitting instructions, the basal edge of the third flange of the yellow end pressed against the wearer's ear and folded backward. When the

8

inward pressure of the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer. And, because the Combat Arms™ earplug was symmetrical, this same problem occurred when the earplug was reversed.

31. Aearo manipulated the test protocol by instructing the test subjects to fold the flanges on the non-inserted end of the earplug back before inserting it into the ear.

32. Using the manipulated fitting instructions, Aearo re-tested the green end of the Combat Arms™ earplugs starting in February 2000. During this re-test of the green end, test subjects folded back the yellow flanges of the earplug (essentially elongating the too-short defective stem) to allow them to insert the earplugs deeper into their ears to obtain a proper fit. Because the yellow flanges were folded back, the basal edge of the third flange no longer pressed against the subject's ear canal, and thus did not cause the earplug to loosen during the testing. Using this manipulated test protocol, Aearo achieved a 22 NRR on the green end of the Combat Arms™ earplug.

33. Due to the symmetrical nature of the Combat Arms™ earplugs, the design defect that affected the fit of the green end similarly affected the fit of the yellow end. The fact that Aearo's testing of the yellow end resulted in a -2 NRR meant that the earplugs did not provide a proper fit (as required by ANSI S3.19-1974, Section 3.2.3) between the ear canal of at least some of the subjects and the earplugs. As a result, some subjects had large

standard deviations across trials on the yellow end test, which suppressed the NRR rating.

34. Nevertheless, Aearo did not re-test the yellow end using the manipulated fitting instructions like it did on the green end, i.e., folding back the flanges on the green end of the earplug before inserting the yellow end into the ear.

35. Aearo did not re-test the yellow end because it knew that it would not be able to obtain a 0 NRR (much less the facially invalid -2 NRR) and further knew the 0 NRR was a major selling point to the U.S. military. An accurate NRR for the yellow end, which would have been higher than 0, would have rendered the Combat Arms™ earplug less attractive to the U.S. military because the military would have known that the earplugs would impair communication.

36. Moreover, the defect in the Combat Arms™ earplugs is more likely to manifest itself during military activities than in a lab where the NRR tests are performed over the span of just a few minutes and the head of the test subject remains virtually motionless during the test. Servicemen, on the other hand, may wear the earplug for an extended period of time and are more active than test subjects in a lab.

37. Because the defect was imperceptible to the wearer, Defendants' design defect went undetected for more than a decade by the U.S. military and those who wore them. It is thus not surprising that hearing damage is now the largest ongoing medical cost the military incurs each year. (Ex. B, David E. Gillespie, *Researchers Evaluate True Effects of*

*Hearing Loss for Soldiers* (Dec. 16, 2015), available at http://www.army.mil/article/160050/Researchers_evaluate_true_effects_of_hearing_loss_for_soldiers/ (last accessed Jan. 16, 2019). The VA thus spends more than $1 billion per year to treat hearing damage suffered by more than 800,000 servicemen. (*Id.; see also* Ex. C, Kay Miller, *Hearing loss widespread among post-9/11 veterans*, The Center for Public Integrity (Aug. 29, 2013), available at http://www.publicintegrity.org/2013/08/29/13283/hearing-loss-widespread-among-post-911-veterans (last visited Jan. 16, 2019) ("The most-widespread injury for [post-9/11] veterans has been hearing loss and other auditory complications…. Hearing maladies cost more than $1.4 billion in veterans' disability payments annually, according to first year 2010 data from the Hearing Center of Excellence, a part of the Department of Defense.")).

### B. Defendants' False Certifications to the U.S. Military

38. In 2003, Aearo submitted a bid in response to the U.S. military's Request for Proposal ("RFP") to supply large quantities of Combat Arms™ earplugs. The RFP required bidders to certify that the earplugs complied with the Salient Characteristics of Medical Procurement Item Description ("MPID") of Solicitation No. SP0200-06-R-4202. In its bid, Aearo certified the Combat Arms™ earplugs complied with the Salient Characteristics of MPID, even though Aearo knew that certification to be false.

39. The pertinent Salient Characteristics of MPID in each RFP, in relevant part, were:

2.1.1.   Ear plugs shall be designed to provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech and other quieter sounds, such as voice commands, on the battlefield.

2.2.2   The sound attenuation of both ends of the ear plugs shall be tested in accordance with ANSI S3.19….

2.4.   <u>Workmanship</u>. The ear plugs shall be free from all defects that detract from their appearance or impair their serviceability.

2.5.   <u>Instructions</u>. Illustrated instructions explaining the proper use and handling of the ear plugs shall be supplied with each unit….

(Ex. D, Solicitation No. SP0200-06-R-4202, at 41-42).

40. Aearo knew that its test protocol did not comply with ANSI S3.19 but nevertheless certified that its testing was fully compliant with the U.S. military's specifications.

41. Aearo also falsely certified that it provided accurate "instructions explaining the proper use and handling of the ear plugs." Aearo knew when it did so that its own testing had revealed a design defect that needed modified fitting instructions to ensure a proper fit that would deliver the promised NRR. At no time did Defendants disclose the modified fitting instructions to the U.S. military—even after winning the bid.

42. Pursuant to Section 2.4 of the MPID, Aearo was required to certify that the "ear plugs shall be free from all defects that detract from their appearance or impair their serviceability." (Ex. D at 41-42). Despite Aearo knowing since 2000 that its Combat Arms™ earplugs suffered from a design defect, Aearo certified to the U.S. military that its earplugs had no defects.

43. Based on its facially invalid test results, Aearo falsely reported to the U.S. military that the yellow end of its Combat Arms™ earplugs had a 0 NRR, which would allow

servicemen to freely communicate with their fellow servicemen and avoid any impairment to hear enemy combatants.

44. Aearo also certified that the green end of its Combat Arms™ earplugs had a 22 NRR, even though Aearo did not disclose the modified fitting instructions necessary to achieve the hearing protection afforded by a 22 NRR. (*See* Ex. E, Combat Arms Earplugs Instructions). Nothing in these fitting instructions disclosed that it was necessary to fold back the flanges of the opposite end to ensure a proper fit and achieve the promised NRR. By failing to provide this disclosure, Aearo falsely overstated the amount of hearing protection afforded by the green end of the earplug and overstated the benefits of the yellow end of the earplug.

45. Based on Aearo's false representations, its bid was the prevailing bid and Aearo entered into the first of a series of IQCs later that year making it the exclusive provider of selective attenuation earplugs to the U.S. military.

46. In subsequent years in response to additional RFPs, Defendants re-certified that the Combat Arms™ earplugs met the MPID criteria, even though Defendants knew that to be false.

47. In total, the U.S. military purchased enough Combat Arms™ earplugs to provide one pair to every serviceman deployed each year in major foreign engagements from 2003 through 2015. (*See* Ex. F, McIlwain, D. Scott *et al.*, *Heritage of Army Audiology and the Road*

*Ahead: The Army Hearing Program*, AMERICAN JOURNAL OF PUBLIC HEALTH, Vol. 98 No. 12 (Dec. 2008)).

48. Defendants continued to sell the Combat Arms™ earplugs to the U.S. military until late 2015, at which time Defendants discontinued the earplug. (Ex. G, Discontinuation: 3M Combat Arms Earplugs Version 2 (Nov. 17, 2015)). Defendants did not recall the earplugs despite discontinuing them due to the design defect.

49. Defendants' misrepresentations about the benefits and protections provided by the Combat Arms™ earplugs caused Plaintiff to suffer hearing loss and tinnitus.

50. At all times after 3M's acquisition of Aearo, 3M knew of, conspired with, and was complicit in Aearo's wrongful acts in marketing and selling the Combat Arms™ earplugs without disclosing the defect or the modified fitting instructions.

## TOLLING OF STATUTES OF LIMITATIONS

51. Under the Servicemembers Civil Relief Act, the period of Plaintiff's military service may not be included in computing any statute of limitations applicable herein. *See* 50 U.S.C. § 3936.

52. Plaintiff could not, by the exercise of reasonable diligence, have discovered Defendants' wrongful acts as the cause of his injuries at an earlier time, because, at the time of these injuries, the cause was unknown to Plaintiff.  Plaintiff did not suspect, nor did Plaintiff have reason to suspect, the cause of these injuries, or the tortious nature of

the conduct causing these injuries, until less than the applicable limitations period prior to the filing of this action.

53. Further, the running of the statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the risks associated with the defects in the Combat Arms™ earplugs.

54. As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that he had been exposed to the defects and risks alleged herein, and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

55. . Through Defendants' affirmative misrepresentations and omissions pertaining to the safety and efficacy of the Combat Arms™ earplugs, Plaintiff was prevented from discovering this information sooner because Defendants misrepresented and continued to misrepresent the defective nature of the Combat Arms™ earplugs.

**COUNT I:  STRICT PRODUCTS LIABILITY – DESIGN DEFECT**

56. Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

57. Defendants are the manufacturers and sellers of the defective Combat Arms™ earplugs.

58. The defective Combat Arms™ earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defectively designed

in that the design of the earplug caused it to loosen in the wearer's ear, which allowed damaging sounds to enter the ear canal.

59. The defective Combat Arms™ earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective and unreasonably dangerous for their ordinary and expected use because they did not stop the damaging loud noises of military use that can cause hearing loss or tinnitus.

60. The defective Combat Arms™ earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective and not reasonably safe for its intended use.

61. Defendants knew of the defect in the Combat Arms™ earplugs.

62. No reasonably prudent manufacturer would design, distribute, and sell an earplug with the knowledge that Defendants had, namely that the stem of the earplug was too short to fit correctly in many people's ears and that if not fitted correctly the earplugs would not guard against loud impulse noises and could cause hearing loss and tinnitus.

63. The defective Combat Arms™ earplugs that the Defendants manufactured, distributed, and sold were delivered to Plaintiff without any change in their defective condition and were used by Plaintiff in the manner expected and intended.

64. Defendants owed a duty of care to Plaintiff to design, manufacture, and sell earplugs that met the specified performance criteria and were otherwise fit for use by

servicemen to protect them from damaging noises typically incurred in military service. Defendants breached this duty.

65. Defendants owed a duty of care to Plaintiff to design and sell earplugs that were fit for use in military service and that performed according to the specifications that Defendants certified the Combat Arms™ earplugs would meet. Defendants breached this duty.

66. Defendants owed a duty of care to Plaintiff to design and sell earplugs that were safe when used for their intended purpose; i.e., when in the presence of loud impulse sounds. Defendants breached this duty.

67. Plaintiff suffered injury and damage as a direct and proximate result of the defective and unreasonably, unsafe, dangerous condition of the Combat Arms™ earplugs that the Defendants manufactured, distributed, and sold.

## COUNT II: STRICT PRODUCT LIABILITY – FAILURE TO WARN

68. Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

69. Defendants are the manufacturers and sellers of the defective Combat Arms™ earplugs.

70. The defective Combat Arms™ earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective because the earplugs did not come with adequate warnings, instructions, or labels.

71. The defective Combat Arms™ earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective because Defendants failed to warn, failed to provide instructions, and failed to provide an adequate label that included the modified fitting instructions necessary for the earplug to fit correctly in the wearer's ear and create the seal necessary to block out the damaging sounds.

72. Defendants had a duty to manufacture, design, and sell the Combat Arms™ earplugs with reasonable and due care for the safety and well-being of wearers, including Plaintiff. Defendants breached that duty.

73. Defendants had a duty to provide adequate warnings and/or instructions to prevent the risks associated with the Combat Arms™ earplugs when worn in the ordinary course. Defendants breached that duty.

74. It was foreseeable to Defendants that the Combat Arms™ earplugs would be unreasonably dangerous if distributed without the warning regarding the risks of damage to the ear with an improper fit and/or modified fitting instructions.

75. Not only was it foreseeable, it was foreseen by Defendants. During testing, Defendants discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit.

76. Defendants also discovered that when the green end of the Combat Arms™ earplug was inserted into the ear using the standard fitting instructions, the basal edge

of the third flange of the yellow end pressed against the wearer's ear and folded backward. When the inward pressure of the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer. And, because the Combat Arms™ earplug was symmetrical, this same problem occurred when the earplug was reversed.

77. Defendants had a post-sale duty to warn of the above alleged product-related defects and risks because Defendants knew or reasonably should have known that the Combat Arms™ earplug posed a substantial risk of harm to servicemen, including Plaintiff; the servicemen who used the Combat Arms™ earplug can reasonably be assumed to be unaware of the risk of harm caused by the above-alleged defects because said defects were imperceptible; a warning or instruction showing how to correctly and safely use the Combat Arms™ earplug could have been effectively communicated to and acted upon by the servicemen to whom a warning or instruction might be provided; and the risk of harm, including but not limited to hearing loss in servicemen, is sufficiently great to justify the slight burden of providing a warning or instruction. Defendants breached this duty by failing to provide a post-sale warning or instruction.

78. The Combat Arms™ earplugs contained no warnings, or in the alternative, inadequate warnings and/or instructions, as to the risk that the Combat Arms™ earplugs would allow damaging sounds to bypass the earplug thereby posing a serious risk to Plaintiff's hearing unbeknownst to Plaintiff.

79. The warnings and instructions that accompanied the Combat Arms™ earplugs failed to provide the level of information that an ordinary wearer would expect when using the Combat Arms™ earplugs in a manner reasonably foreseeable to Defendants.

80. Had Plaintiff received a proper or adequate warning as to the risks associated with the use of the Combat Arms™ earplugs in the manner contemplated by Defendants, he would not have used them.

81. Additionally, and/or alternatively, had Plaintiff received the modified fitting instructions that were used by Defendants during the testing, which were not disclosed to Plaintiff, Plaintiff would have followed the modified fitting instructions to ensure a proper seal to prevent damaging sounds from entering the ear canal.

82. Plaintiff suffered injury and damage as a direct and proximate result of the use-defectiveness and Defendants' failures to warn and/or provide adequate instructions regarding the dangerous condition of the Combat Arms™ earplugs that the Defendants manufactured, distributed, and sold.

### COUNT III: NEGLIGENCE

83. Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

84. Defendants had a duty to each use their professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar business by a person or entity in Defendants' business of designing, developing, testing, manufacturing, marketing, and distributing hearing protection devices.

85. Defendants further had a duty to comply with the certifications made to the U.S. government about the qualities and performance characteristics of the Combat Arms™ earplugs. Plaintiff is among the class of persons designed to be protected by these regulations and certification standards. He was a foreseeable plaintiff to Defendants.

86. Defendants breached these duties by failing to exercise the required degree of care in designing, developing, testing, manufacturing, marketing, and distributing hearing protection devices in a manner to provide the specified level of hearing protection.

87. The damages suffered by Plaintiff was or should have been reasonably foreseeable to Defendants.

88. Plaintiff was damaged by Defendants' conduct, including but not limited to damage to his hearing.

89. Defendants' breaches are a direct and proximate cause of the injuries and damages suffered by Plaintiff in an amount not yet fully determined, but in excess of $75,001, exclusive of costs and interest. Plaintiff is entitled to recover damages and other relief as available, at law or equity, as a direct and proximate result of Defendants' conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests from Defendants, jointly and severally, compensatory damages, together with appropriate equitable relief, costs and attorneys' fees as follows:

A. Award of monetary damages, including compensatory relief, to which

Plaintiff is entitled at the time of trial in an amount exceeding $75,001,

exclusive of costs and interest.

B. Award of pre- and post-judgment interest.

C. Award of costs.

D. Award of all such other and further relief as may be available at law or

equity and may be proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

## ACKNOWLEDGMENT

The undersigned acknowledge sanctions may be imposed under Minn. Stat. § 549.211.

SCHWEBEL GOETZ & SIEBEN, P.A.


Dated: January 24, 2019          By /s/ William R. Sieben
                                 William R. Sieben (#100808)
                                 Alicia N. Sieben (#389640)
                                 Matthew J. Barber (#397240)
                                 5120 IDS Center
                                 80 South Eighth Street
                                 Minneapolis, Minnesota 55402-2246
                                 Telephone:  612-377-7777
                                 Fax: 612-333-6311
                                 Email: bsieben@schwebel.com
                                      asieben@schwebel.com
                                      mbarber@schwebel.com


                                 and

PAUL LLP

Richard M. Paul III (pro hac vice forthcoming)

Ashlea G. Schwarz (pro hac vice forthcoming)

Laura C. Fellows (pro hac vice forthcoming)

601 Walnut Street, Suite 300

Kansas City, Missouri 64106

T: (816) 984-8100

Rick@PaulLLP.com

Ashlea@PaulLLP.com

Laura@PaulLLP.com

**ATTORNEYS FOR PLAINTIFF**